John DAVIS et al., Plaintiffs,

v.

Ronald HUBBARD et al., Defendants,

United States of America, Amicus
Curiae.

No. C 73–205.

United States District Court,
N. D. Ohio, W. D.

Sept. 16, 1980.

Gerald B. Lackey, Toledo, Ohio; C. Thomas McCarter, Joseph F. Vargyas, John C. Lamb, Kathleen Jolly and John Holme, Advocates for Basic Legal Equal., Toledo, Ohio, for plaintiffs.

David J. Young, Murphy, Young & Smith, Columbus, Ohio, Lucy L. Thomson, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

WALINSKI, District Judge:

### PRELIMINARY STATEMENT

This is the third in a series of Orders addressing the single–judge issues herein.[1]

---

1. See *Order*, September 9, 1974 and *Opinion and Order*, September 28, 1978. Of the twenty–three single–judge issues originally identified, only Issues Seventeen and Eighteen now remain undecided. Plaintiffs' claims that the staffing procedure in effect at Lima State Hos-

Said orders shall serve as the Court's findings of fact and conclusions of law, pursuant to Rule 52, F.R.Civ.P.

## ISSUES PRESENTED

*ISSUE 5: WHETHER THE METHODS USED BY THE PROFESSIONAL STAFF TO CLINICALLY EVALUATE AND DIAGNOSE PATIENTS AT LIMA STATE HOSPITAL IS A VIOLATION OF THE FOURTEENTH AMENDMENT. THIS IS MEANT TO INCLUDE, BUT IS NOT LIMITED TO, TESTING, LACK OF TREATMENT, LACK OF PROFESSIONAL QUALIFICATIONS OF THE STAFF.*

A review of the subissues and arguments presented in support of the parties' respective positions on this issue indicate to the Court that they have been addressed elsewhere through the Order of December 9, 1974 and subsequent supplemental Orders, including the Order issued this date.

It is therefore the opinion of the Court that this issue requires no individual discussion.

*ISSUE 6: WHAT SHOULD BE APPROPRIATE STANDARDS FOR NUMBERS AND QUALIFICATIONS OF STAFF.*

A. *Numbers of Staff*

■ The stipulations filed herein reflect the following staff (for a population at that time of approximately seven hundred fifty (750)) [Stip 408]:

| | |
|---|---|
| 6 | Physician Specialists |
| 3 | Medical Assistants (unlicensed physicians) |
| 8 | Psychologists |
| 1 | Caseworker |
| 10 | Social Workers |
| 21 | Activity Therapists |
| 10 | Teachers |
| 1 | Educational Specialist |
| 1 | Principal |
| 14 | Nurses |
| 1 | Pharmacist |
| 1 | Pharmacist Aide |
| 1 | Psychoatric Nurse Director |
| 271 | Attendants |
| 1 | Institutional Administrator |
| 2 | Chaplains |

There appears to be no question that an adequate staff [in size and qualifications] is an indispensible component in the delivery of treatment to the institutionalized. Both plaintiffs and defendants approached the Court with proposed plans for staffing.

The plaintiffs submitted the depositions of three (3) experts, each of whom proposed certain patient/staff ratios much like those ordered in *Wyatt v. Stickney*, 344 F.Supp. 373, 383 (M.D.Ala.1972).

The defendants propose a programmed staffing method development for the California Department of Mental Hygiene known as SCOPE (Staffing the Care of Patients Effectively). The SCOPE program grew out of a request by the California Legislature for a study to evaluate the treatment manpower needs of the state hospitals and to develop recommendations for new standards. A Committee was then formed of representatives of:

American Association for Mental Deficiency, Region III

American Psychiatric Association, Northern California Psychiatric Society

American Psychiatric Association, Southern California Psychiatric Society

California Association for Mental Health

California Council for Retarded Children

California Medical Association

California Nurses Association

California Society of Psychiatric Technicians

California State Psychological Association

California State Council of National Association of Social Workers

Rehabilitation Service Association

The Committee met for approximately eighteen (18) months and prepared a report

---

pital [hereinafter LSH] violates their rights to due process of law, which was originally deter-

mined a three–judge issue, must await further evidentiary hearings before decision.

which was designed "to establish basic levels of treatment staff time" for patients in the state's mental health facilities. Essentially, the SCOPE program is a statistical and engineering approach to evaluating the time requirements for the performance of medical, psychological, social work, rehabilitative and ward service *functions* within the hospital. The actual implementation involves stopwatch measurements of the times needed for trained, experienced personnel to perform needed custodial tasks; work samplings were then performed at random times, twenty–four (24) hours a day, over a seven (7) day period; finally, physicians, psychologists, rehabilitation therapy specialists, social workers, nursing supervisors, as well as nurses and psychiatric technicians were asked to report their work activities under eleven (11) different headings over a seven (7) day period. The Committee then made an input decision as to the level of care to be provided each patient and, by inputing the various factors (including, *inter alia*, a variable dependent upon a cross–sectional study of the average patient's demand reflected by a study of personal characteristics and individualized treatment plan content) was able to translate task requirements into a usable calculation of needed staff time to perform those functions. (See generally Ex. 1, 2 to Naleway Depo.)

Plaintiffs' experts suggested that a method for determining adequate staff size was to propose certain set ratios of staff to patients which would be maintained as minimums. Unfortunately there was a wide variance in the opinions of the various experts. See *Amicus* Brief, Chart at 60–61. Even while proposing ratios, Dr. Clark qualified his recommendation with "I think the make up of the treatment team would depend to some extent on type of patient and their particular needs. It could include some of the following types of individuals, not necessarily all of them and not necessarily limited to them * * *." Clark Depo. at 64. Dr. Brelje suggested a detailed staffing proposal but followed with:

Now, that I hold out as one possible way of staffing a unit of 70 patients. It seems to me that still meeting, say, accreditation standards, it's possible to staff that 70 with a differing of consultation within it * * *. So I would hate to have that staffing pattern propogated as an ideal or the ultimate or something. Brelje Depo. at 112.

Dr. Walter Fox, who testified in *Wyatt*, also proposed minimum staffing levels as set figures but, in response to an inquiry about whether a more flexible method might be preferable answered:

"Yes, I think there is a better system. The Joint Commission, for instance, does not set ratios, but uses such terms as 'there shall be adequate staffed social service departments or functions'".

Fox Depo. at 58. Dr. Fox then explained that the Commission [The Joint Commission on the Accreditation of Hospitals] uses a voluminous questionnaire and an on–site survey coupled with a computer analysis of the data to determine the adequacy of staffing levels. Fox Depo. at 59.

The plaintiffs seem to base their objections to the SCOPE system on the premise that it is simply quantitative in nature. Unfortunately *any* system of setting staff levels must address that problem. Only qualified, well–trained staff members dedicated to their respective professions can assure that *quality* treatment is being provided.

Another objection to an implementation of the system (at least in the form which it is used in California) is that it is premised upon an unacceptably low level of custodial care (i. e. three (3) baths per week). That objection is well taken; however, this Court has, in its earlier Orders, set out very detailed and specific levels of care to be afforded the patients at LSH. It is assumed that any computerized time–study audits used by these defendants would input, as standards, the details of the Orders herein.

Finally, the plaintiffs contend that the SCOPE audit and survey conducted at LSH by defendants prior to trial of this action are, of necessity, deficient in that no individualized treatment plans were in effect

and that, therefore, it would have been impossible to project the needed professional staff times to provide psychiatric and rehabilitative treatment. Such is no longer the case. Individualized treatment plans have been ordered and implemented for each of the patients at LSH. Again, it is presumed that those plans would provide the treatment criteria upon which to base a need for specific numbers of professional treatment personnel.

It therefore appearing to the Court that a systems approach to staffing is a scientifically valid and reasonable method, applied within the parameters of this and the earlier Orders of the Court, it is

ORDERED that the defendants prepare forthwith an analysis of staffing needs based upon the methodology developed for the California Department of Mental Hygiene. In order to monitor compliance with this Order, defendants will provide the Special Master with copies of preliminary input data including, but not limited to, service needs of patients as well as proposed diagnostic and treatment programs necessary to meet those service needs most effectively. (It is expected that these proposed programs will find their genesis in the individual treatment plans). The proposed programs will be broken down into specific tasks by specific types of individuals, and attaching to each task the time necessary for effective performance. Again, following the methodology proposed by defendants, it is assumed that the tasks and task times will be classified by patient type and within one of three (3) program phase headings–intake program, residential treatment program (including non–professional custodial functions and professional treatment tasks) and release programs (including both intramural and extramural prerelease planning services).

Providing such input data before translating functional needs into requisite staffing levels will allow this Court to monitor compliance with the crux of this entire matter–the delivery of treatment guaranteed plaintiffs by the earlier remedial orders of this Court.

As a postscript, the Court notes that the defendants have repeatedly asserted that preliminary studies have indicated that SCOPE may well result in higher gross numbers of staff than the ratios reflected in *Wyatt*. While the Court is accepting defendants' opposition to fixed ratios, it will look with some suspicion upon a result which falls beneath the *Wyatt* standards.

**B. Racial And Gender Composition Of The Staff.**

Plaintiffs seek an order of this Court requiring defendants to appoint "a representative number of black employees at LSH, as well as a staff varied in sex."

Essentially the argument is that adequate treatment requires a staff roughly in proportion (racially) to the racial composition of the patient population. At the time of the stipulations herein, the patient population was 44.8% black (Def. Ex. 36).

While the expert testimony taken herein lent credence to the claim that racial identity with patients may well be helpful in the treatment process, the Court is unpersuaded that adequate treatment cannot be provided in its absence.

Viewed in the context of a right to treatment this Court will order no affirmative hiring practices to increase either the number of blacks or women on the professional or non–professional staff at LSH.

**C. Qualifications Of Psychologists And Attendants.**

**1. Psychologists.**

Plaintiffs argue that status as a QMHP Psychologist be conditioned upon the candidate's possession of a Ph.D. in clinical psychology. Defendants maintain that the individual need only be licensed as a psychologist under Ohio Revised Code § 4732 to qualify. Since 1976, only persons with a Ph.D. would qualify for a license under Ohio law. Plaintiffs' argument, then, would seem to address itself primarily to people licensed before 1976.

A more significant standard would appear to be a requirement that the psychologist be trained in the relevant sub–area of his specialty, *i. e.*, clinical psychology v. education, guidance or counselling.

It is therefore the Order of the Court that the requirement for qualification as a QMHP Psychologist (as it is used herein) shall be:

An individual with a Ph.D. in clinical psychology

*or*

A licensed psychologist (pursuant to Ohio Revised Code § 4732) with a degree, or four (4) years of experience in, clinical psychology.

### 2. *Attendants.*

The experts were essentially in agreement, and this Court will find, that the minimum entry qualification for attendants hired after the date of this Order shall be:

A high school diploma, together with a demonstrated stability and ability to work with others.

Defendants are hereby directed to formulate and implement a testing procedure to screen from employment those persons whose psychological make–up would be inappropriate to a therapeutic environment.

The Court further refers the parties to the contents of this *Order* in regard to Issue 9 (infra) on the in–service training opportunities to be provided to the non–professional staff.

*ISSUE 7: WHETHER THE FOURTEENTH AMENDMENT REQUIRES PEER REVIEW OF INDIVIDUAL TREATMENT PLANS BY PROFESSIONALS NOT OTHERWISE EMPLOYED BY THE DEFENDANTS.*

■ This court, in its Order of September 9, 1974, required that an individual treatment plan be formulated for each patient covering the period from initial diagnosis and observation through release to a less restrictive environment and transitional care for release to the community. *See* § B, p. 12–18.

Plaintiffs contend that, for a number of reasons, the Fourteenth Amendment requires that the mandated plans (and presumably, their implementation) be monitored by qualified professionals not regularly employed by the Department of Mental Health and Mental Retardation.

Although outside peer review may well be a desirable way to monitor compliance with a central portion of this Court's 1974 Order, it cannot be said to be mandated as a Constitutional minimum.

Assuming that the professional staff is qualified, one of plaintiff's own experts conceded that an internal peer review would be satisfactory. *See* Dr. Fox Testimony, Tr. 255–259.

The Court has set qualifications prerequisite for the professional staff and must assume, without evidence to the contrary, that the professional staff is qualified to discharge its responsibilities.

The Standards promulgated by the Joint Commission for the Accreditation of Hospitals do not impose an outside peer review requirement for patient care evaluation. JCAH Standards at 35.

The Court finds that the defendants' position on outside peer review is well taken and hereby declines to order such a procedure.

*ISSUE 9: WHETHER THE IN–SERVICE TRAINING AT LSH MEETS CONSTITUTIONAL STANDARDS.*

*FACTS:*

All new LSH employees are required to complete an orientation program designed to familiarize them with both the organization and structure of both the Ohio Department of Mental Health and Retardation and Lima State Hospital itself. An eight (8) hour course in first aid is included in the thirty–two (32) hour curriculum (Stip. 126). During the probationary period allowed by the Ohio Civil Service, direct care personnel are required to complete an eighty (80) hour program which outlines internal administrative procedures, various ailments common to the patient population and common-

ly used pharmaceuticals (Stip. 125, 127). A third step training program for Psychiatric Aide I and Forensic Aid covers a more extensive discussion of direct patient care and treatment.

Training of Social Workers consists of a week of general orientation and two weeks of supervised work. Thereafter the social worker is assigned a regular case load. There is no scheduled in–service training for social workers. (Stip. 159, 160).

Psychologists are likewise given a brief period of supervised employment and are then provided with a case load. (Stip. 174, Seitz Depo., p. 135–136).

In–service training is absent for most, if not all, of the professional staff. The stipulations herein revealed no such programs for registered nurses (Stip. 109), or social workers (Stip. 160). Testimony at trial provided a similar conclusion in respect to the education staff and the balance of the professional staff (Tr. 102, 406, 579).

*CONCLUSIONS OF LAW:*

■ The right to treatment must necessarily presuppose a trained and qualified staff. *See generally, Wyatt v. Stickney,* 344 F.Supp. 373, 383, 405–406 (M.D.Ala. 1972).

■ The experts who testified herein were virtually unanimous in concluding that continuous in–service training is essential for professional and non–professional staff in order for them to improve and update their knowledge and abilities (Tr. 101–102; Fox Depo., p. 97; Clark Depo., p. 62; Brelje Depo., p. 101). Even defendants' Director of Mental Health admitted that such programs were badly needed. (See Pl. Ex. L–1 to Gaver Depo., p. 4).

The attendant in–service program, while providing an academic background, is deficient in practical training and little follow–up is provided to ensure that more than lip–service is paid to the training program.

In–service training appears particularly important herein considering that the defendants have, throughout the course of this litigation, taken the position that it is extremely difficult, if not impossible, to at-

tract qualified personnel to the institution, primarily because of its location. It would appear that the only alternative method of building a qualified staff is to provide intensive training for those willing to accept initial employment.

It is therefore Ordered that the defendants provide a full range (both professional and nonprofessional) staff training program that includes:

(1) Orientation for all new employees to teach them the philosophy, organization, programs, practices, and goals of the facility with particular emphasis on practical aspects of team treatment, encouraging nonprofessional participation in treatment programs;

(2) Induction training for each new employee, so that his or her skills in working with patients are increased;

(3) In–service training for employees who have not achieved the desired level of competence, and opportunities for continuous in–service training to update and improve the skills and competence of *all* employees (both professional and nonprofessional).

(4) Continuing education activities for all staff shall focus on reorienting current attitudes and on the adoption of a team approach to treatment.

(5) Staff education programs shall use consultants and shall capitalize on such new educational approaches as simulation, role playing, videotaping, feedback, on the job training activities, and the like.

(6) Direct care staff shall be given intensive in-service training with emphasis on the particular things they can do to assist in program activities for patients.

(7) The institution shall institute systematic exit interviews for all employees terminating employment. These interviews shall be forwarded to the Department of Mental Health and Mental Retardation central office for evaluation. The interview format shall be used not only to determine any causes of employee dissatisfaction, but also to elicit any instances of dehumanizing or

abusive practices and other information relevant to efforts to improve care and programming for patients and the working conditions for employees.

## ISSUE 10: WHAT CHANGES IN THE PHYSICAL PLANT AT LIMA STATE HOSPITAL ARE CONSTITUTIONALLY REQUIRED?

### FACTS

Lima State Hospital was completed and began receiving patients in 1915. At trial it housed patients in two principal buildings—the "old" building with twenty–four (24) wards (1,010 rooms), dining and kitchen facilities, the "male hospital"; the "new" ("Ascherman") Unit completed in 1952 with four (4) wards (276 rooms), dining facilities, and a segregated visiting area (Stip. 14, 15).

The entire facility is surrounded by a thirteen (13) foot high chain link fence, topped with barbed wire. Incorporated in the fencing are seven (7) guard towers manned on a round–the–clock basis.

Mens wards at LSH are generally classified as strong, dormitory or open with descending levels of restriction on movement in each (Stip. 17, 20–23). Other types of wards include observation, womens, and chronic medical. In those wards which utilize individual rooms, room size varies from 6' × 9' in the "old" building to 7' × 11× in the Ascherman building. At no time since 1974 has more than one patient occupied each of the rooms.

While the institution purports to be a hospital, the facility is unquestionably a prison in its design, furnishings and atmosphere. See Stip., App. H at p. 2; id., App. G at p. 2. See also testimony of Carl B. Clements, Ph.D., Tr. at p. 36. All evidence before the Court tends to confirm Dr. Terry Brelje's description of the conditions, attitudes and environment of LSH as "dehumanizing, repressive and countertherapeutic–" Stip., App. G, "Summary of Findings–Lima State Hospital", p. 2.

### CONCLUSIONS OF LAW:

■ The initial Order of this Court recognized plaintiffs' constitutional right to treatment in a humane therapeutic environ-

ment. Order, September 9, 1974. The expert opinion offered in this cause, referenced above, established beyond question that LSH failed to provide such a humane therapeutic environment, and further established that the physical features of the institution contributed heavily to this failure. Accordingly, numerous physical changes were mandated at LSH by this Court's Order of September 9, 1974, including the right to keep and use personal possessions, Order at p. 25, privacy and solitude, Order at p. 26, floor space in multi–patient rooms, installation of screens and curtains, toilets for single rooms, Order at 28, closets or lockers for personal possessions, partitions between toilets and bathing areas, day room space and furnishings, Order at 29, dining room space, linen and laundry, housekeeping, heat and ventilation, Order at 30, hot water, refuse facilities, and fire safety, Order at 31–32. The Court hereby reaffirms those mandates and further determines that the State must forthwith reach full compliance with the 1974 Order. Although numerous waivers have been granted since issuance of that Order in those areas which would require extensive capital expenditures, (primarily on the assurance that regional forensic centers were planned to reduce the population of LSH,) sufficient time has elapsed within which the defendants could reasonably have been expected to either close this facility or reduce its population to such a level that the required capital expenditure would be greatly diminished.

Beyond the relief previously mandated, plaintiffs ask the Court to compel numerous other remedial measures. Defendants take the position that additional physical changes are unnecessary to comply with constitutionally minimum standards and that further, such changes would seriously impair the maximum security character of the institution.

■ In addressing the various additional remedial measures sought relative to the physical plant it is important to once again recognize that this Court is not empowered to compel the State to provide all things

considered optimally desirable in a psychiatric facility. Rather, the power of the Court is limited to determining what remedial action is required to satisfy judicially recognized constitutional minimums. It is under this analytical scheme that plaintiffs' claims must be scrutinized, keeping in mind that LSH is a maximum security psychiatric facility and as such presents unique problems. The Court adopts as its benchmark the notion that a remedial measure is not constitutionally compelled unless its absence causes a condition which is violative of the Eighth Amendment prohibition against cruel and unusual punishment, or is so countertherapeutic as to infringe upon plaintiffs' right to treatment in a humane therapeutic environment. It is against this standard that plaintiffs' claims are measured.

## A. Room Size

Plaintiffs ask the Court to mandate that all patients have private rooms with no less than 100 square feet of floor space.

The Court finds no authority for the proposition that all patients must have their own rooms. The standards of the Joint Commission on Accreditation of Hospitals require only that sleeping facilities provide appropriate privacy for each patient. This requirement is adequately met by compliance with the provisions of Pt. III, § G(2) of the 1974 Order. The Court therefore declines to require private rooms for all patients.

The issue of room size was dealt with extensively in the case of *Chapman v. Rhodes*, 434 F.Supp. 1007, 1021 (S.D.Ohio 1977). In that case, the Court did extensive legal and nonlegal research on the acceptable living space which meets constitutional minimums,[2] analyzing the issue under the Eighth Amendment. *Citing Gates v. Collier*, 423 F.Supp. 732, 743 (N.D.Miss.1976), the Court found that " * * * 50 square feet of living space is the minimal acceptable requirement to comport with the Constitution." It has also been held that, assuming that additional space is provided for recreation and communications purposes (day rooms), single occupancy isolation cells of 60 square feet comply with the Constitutional minimums. *See Pugh v. Locke*, 406 F.Supp. 318 (N.D.Ala.1976).

The Court finds no judicial precedent for the proposition that 100 square feet of floor space is a constitutional minimum. Moreover, even the expert witnesses who testified herein or whose depositions were provided to this Court were unwilling to state that 100 square feet constituted a constitutional minimum. Dr. Brelje testified that "if the treatment itself that's occurring is adequate or even better than adequate, * * * one might be able to live with [the current 7′ × 9′ rooms]." Brelje's Depo., at 152. Dr. Fox, another plaintiffs' expert, testified that the important consideration was in room arrangement, not its size. Fox Depo., at 88. If the room provided carpeting, drapery, access to lavatories, a place for personal belongings and a place to sit and write, "I wouldn't be too concerned about the size of it." *Id.*

The Court therefore finds that the room size presently afforded patients at LSH residing in individual rooms is within constitutional minimums. Further the Court reasserts its mandate of the 1974 *Order* (Pt. III, § G(2)) which requires that patients residing in multi–residency rooms be afforded at least 80 square feet of living space adequately screened.

2. In *Chapman v. Rhodes, supra,* the district court reviewed at literature of the social sciences at length and found that the American Correctional Institute has concluded that 75 square feet is the minimally acceptable standard. The National Sheriff's Association Handbook on Jail Architecture, p. 62 (1975) asserts that single occupancy detention rooms should average 70–80 square feet. The National Sheriff's Association Manual on Jail Administration (1970) suggests that in multiple celling 55 square feet of space per occupant is minimum.

The National Council on Crime and Delinquency Model Act for the Protection of the Rights of Prisoners (1972) concludes that "not less than 50 square feet of floor space in any confined sleeping area" should be provided as the minimum. The Report of the Special Civilian Committee for the Study of the United States Army Confinement System (1970) indicates that the Army standard in 1969 was 55 square feet. *All citations from Chapman v. Rhodes,* 434 F.Supp. 1007, 1021 (1977).

### B. *Ventilation*

This Court has previously mandated that: Adequate heating and ventilation systems and equipment shall be afforded to maintain temperatures and air changes which are required for the comfort of all residents at all times. Ventilation systems shall be adequate to remove steam and offensive odors or to mask such odors.

Pt. III, § G(10), *Order* of September 4, 1974. Plaintiffs seek a further order requiring air conditioning to be installed in all living quarters.

The Court is unable to find a single case in which a court has imposed a blanket requirement of air conditioning. The more reasonable position appears to be that taken by the Court in *Wyatt v. Stickney*, 344 F.Supp. 373 (N.D.Ala.1972), in which the Court ordered that temperatures not exceed 83° Fahrenheit nor fall beneath 68° Fahrenheit. That standard is imposed herein and the defendants are hereby ordered to provide such ventilation systems (or air conditioning) to insure that that temperature range is assured within the institution.

### C. *Lighting*

Plaintiffs ask the Court to mandate that all patient areas be provided with proper and adequate lighting, and that the lighting in each individual cell be controlled by the resident. The record supports plaintiffs' contention that the absence of adequate light, and control over light, creates a demeaning and non–therapeutic environment, and the Court therefore mandates such relief.

### D. *Toilets, Bathing Facilities and Lavatories*

Perhaps the most offensive evidence presented herein related to the failure to provide adequate and private toilet, bathing and lavatory facilities. It does not take a medical expert to conclude that the absence of such facilities is dehumanizing and countertherapeutic. In addition to the remedial measures required by Pt. III, § G(2), (3) and (4) of the 1974 *Order* it is hereby ordered that:

(a) Each shower for patient use shall be equipped with a mixing valve which will enable the patient to control the water temperature.

(b) A lavatory sink shall be provided in each individual room, or, as an alternative, the patient shall be allowed egress at all times from his room to allow him to reach a supply of water for drinking and washing.

### E. *Removal of Security Apparatus*

Plaintiffs also seek relief regarding the security system at LSH. This Court has already dealt extensively with the role of security at the facility. See *Order and Opinion* of September 24, 1978. On the record before it, the Court cannot find that the existence of security fences, grill work, window bars, gates, peepholes and locks is so countertherapeutic as to violate the patients' constitutional right to treatment. Therefore, recognizing the maximum security character of the institution, the Court must deny plaintiffs' demands for alterations in the physical security apparatus of the facility. As a safety measure, however, the Court orders that door locks shall be kept to a minimum, consistent with the maximum security nature of the facility. Further, as a general rule, doors to patient rooms and wards shall not be locked, except as provided by state or local authorities. When such approval exists, the use of locks shall be in accordance with the National Fire Protection Association.

### F. *New Construction*

Plaintiffs ask the Court to order the construction of a modern activities building as well as additional buildings for the purpose of providing therapy, vocational and occupational rehabilitation and recreation.

Defendants do not contest the appropriateness of providing adequate space for these functions, but do challenge the need for new construction to accommodate such functions. Given the size of the existing facilities and the reduced population therein

(currently slightly in excess of 400 patients), the Court finds no support in the record for plaintiffs' claim that additional construction is constitutionally required. The existing structures, properly utilized, would appear to afford adequate space for providing all constitutionally mandated services. Therefore, the Court hereby declines to order the additional construction prayed for.

### G. Visitation and Reintegration

The importance of family and community ties to an effective treatment program and community reintegration is clearly established by the record. Therefore, the Court hereby orders that:

(a) The facility shall define, and be accessible to, the population it serves.

(b) Attractively furnished rooms or areas should be provided for private visitation between patients and visitors.

(c) Policies regarding visitation shall include the patient's right to privacy. Places for visiting in private shall be provided.

### H. Furnishings

The Court has previously mandated that all dayrooms be attractively and adequately furnished. Lest there be any variance relative to patient living areas, it is further ordered that all patient living quarters shall be adequately furnished, pleasantly painted, with appropriate floor and window coverings.

Miscellaneous other measures of relief are requested by plaintiffs, including, *inter alia*, a laundry area, accessible to all patients, for washing clothes. While this and other measures might be desirable, the Court cannot find that the absence of such will infringe upon plaintiffs' constitutional rights. Therefore all other specific measures of relief sought by plaintiffs are denied.

The defendants are hereby ordered to provide this Court with a plan and time table for implementing the above requirements, as well as all improvements mandated by the Court's *Order* of September 4, 1974 which have not yet been made. That plan shall be submitted to the Special Master on or before December 1, 1980. The Court shall maintain jurisdiction to determine the adequacy of the plan and schedule.

*ISSUE 11: WHETHER PATIENTS AT LIMA STATE HOSPITAL HAVE A CONSTITUTIONAL RIGHT TO PRIOR CONSENT TO THE ADMINISTRATION OF MEDICATION.*

*ISSUE 12: WHETHER PATIENTS AT LIMA STATE HOSPITAL HAVE THE CONSTITUTIONAL RIGHT TO PRIOR CONSENT TO HIS OR HER PARTICIPATION IN PARTICULAR TREATMENT MODALITIES.*

When originally framed, Issues Eleven and Twelve dealt with the constitutional limitations on the State's power to administer a number of different types of treatment. Specifically, these issues asked whether the State must obtain a patient's informed consent before subjecting him to (1) psychotropic drugs; (2) convulsive therapy; and (3) behavior modification programs (the Ascherman self–government program, the token economy system, and reality therapy). Since the hearing and post–hearing briefing by the parties on the issues, LSH has discontinued its compulsory behavior modification programs, and the issue of the patient's right to refuse convulsive therapy (if not his participation in one of the behavior modification programs) has been mooted with the enactment of Ohio Revised Code § 5122.271.[3] Thus, of the treatments origi-

---

**3.** Ohio Revised Code § 5122.271, in part provides:

(A) * * * the chief medical officer, or in a nonpublic hospital, the attending physician responsible for a patient's care shall provide all information, including expected physical and medical consequences, necessary to enable any patient of a hospital for the mentally ill to give a fully informed, intelligent, and knowing consent, the opportunity to consult with independent specialists and counsel, and the right to refuse for any of the following:

(1) Surgery;

(2) Convulsive therapy;

(3) Major aversive interventions;

(4) Sterilization;

nally included within the framework of Issues Eleven and Twelve, only the compulsory administration of psychotropic drugs remains.[4]

### I. Facts:

#### A. The Use of Psychotropic Drugs at LSH[5]

By far the most popular form of "treatment" at LSH is the use of psychotropic drugs. Approximately 73% of the patients receive some kind of psychotropic drug, with the "usual" dosage being the twice daily administration of the combination of 100 milligrams thorazine, 10 milligrams stelazine, and 2 milligrams artane.[6] (Stip. 166, 281; Test. Dr. G. Clark.) Such widespread use of psychotropic drugs, both in terms of the number of patients receiving drugs and the dosages that they receive, is not, how-

(5) Any unusually hazardous treatment procedures;
(6) Psycho–surgery
No Ohio court has yet interpreted this provision, but it is at least arguable that the behavior modification programs that were practiced at LSH could be classified as "major aversive interventions."

4. LSH also offers and has always offered, on a more or less limited basis, individual and group psychotherapy. Plaintiffs, however, have not challenged this type of treatment and the Court, therefore, will not consider any issue that compulsory participation in these programs might raise. In this regard, however, this Court simply notes that the patients' interests which are implicated by the forced administration of psychotropic drugs and which may be worthy of constitutional protection are not implicated to the same degree by such traditional treatments. See Section II, infra.

The Court further notes that many of the patients at LSH have been compelled to take a variety of drugs for physical (as opposed to psychological) disorders. Whether the compulsory treatment with such drugs raises a constitutional question has not been addressed by the parties to this action, and, at any rate, the record now before the Court provides an inadequate basis upon which the issue could be considered. Nonetheless, much of this Court's discussion with respect to whether patients have a constitutional right to refuse psychotropic drugs may apply equally to the use of other drugs.

5. The statement of facts relates only to the evidence admitted at trial of this cause.

ever, necessarily supported by any sound medical course of treatment. Put simply, the testimony at trial established that the prevalent use of psychotropic drugs is countertherapeutic and can be justified only for reasons other than treatment—namely, for the convenience of the staff and for punishment.[7] (Test. of Dr. G. Clark; Test. of Dr. W. Fox; Stipulations by the parties, Appendix H.)

Psychotropic drugs are not only overprescribed; they are also freely prescribed. They are prescribed by both licensed and unlicensed physicians. Both licensed and unlicensed physicians regularly prescribe drugs for any patient in the institution without regard to whether he is personally assigned to the patient or whether he has even seen the patient. It is not unusual for attendants to recommend a certain dosage or increased dosage. Such recommenda-

6. Other drugs administered include Ritalin, Navane, Mellaril, Hadol, Elavil, Trilafon, and Tobranel.

7. In this regard, LSH appears to be little different than any other large institution for the mentally ill. As one expert in the field has noted:

Many physicians, nurses, guardians, and family members who resent the patient's behavior and are threatened by potential acts of violence fail to distinguish between manifestations of illness and reactions to frustrations. Hence, drugs are prescribed to solve all types of management problems, and failure to achieve the desired results causes an escalation of dosage, changes of drugs, and polypharmacy. It is often reported that patients refuse to ingest their pills or that relatives fail to supervise the proper administration of medicines. Less publicized is the patient's dependence on drugs. The medical staff gains a feeling of accomplishment from the patient's adherence to a prescribed regime, while the nursing personnel and relatives, who are in more direct contact with the patient, derive a spurious feeling of security when the doctor's orders are carried out. Thus, the prescribing of drugs has in many cases become a ritual in which patients, family members, and physicians participate. * * [N]euroleptics are often used for solving psychological, social, administrative, and other nonmedical problems.
Crane, Clinical Psychopharmacology in its 20th Year, 181 Science 124, 125 (1973).

tions are often accepted by the physician without having examined the patient. Further, when dealing with an especially disturbed patient, attendants can obtain additional medication by submitting appropriate forms to the pharmacy when there is no physician available. Also, drugs are at times prescribed to be given PRN, or "as necessary." When this is done, an attendant may request medication without review by the authorizing physician. (Stips. 282–91.) At times, a patient may, by request, have his dosage increased. Nonetheless, patients are generally not given the opportunity to refuse psychotropic drugs, although roughly 85% of the patients are capable of rationally deciding whether to consent to their use.[8] Indeed, they often are not even aware of the type of drug administered, the reasons why it is prescribed, or the risks associated with its use.

### B. Psychotropic Drugs and Their Effects

The term psychotropic, or "mood altering" drug describes several categories of major tranquilizers (also called antipsychotic or neuroleptic drugs), antianxiety drugs (minor tranquilizers), antidepressants, sedatives (e. g., barbituates), and hypnotics. None of the psychotropic drugs cures mental illness, but each category of drugs serves a separate function, and each produces distinct side effects and risk associated with its usage.[9] The most relied on class of psychotropics (at least at LSH) are the neuroleptics, especially, as earlier mentioned, thorazine.[10] It is this class of drugs on which the Court will focus its attention.

Though there appears to be no generally accepted theory that explains the biochemical manner in which the drugs work, the beneficial effects of antipsychotic drugs are on thought processes and the brain's ability to sort out and integrate perceptions and memory. That is, they stabilize and blunt thought processes. For this reason they are used most often in the treatment of schizophrenia, see Eisenberg, Psychiatric Intervention, 229 Scientific Am. 116 (Sept. 1973); Kinross–Wright, The Current Status of Phenothiazines, 200 J.A.M.A. 461 (1976). They are also used for treatment of non–schizophrenic conditions, but recent studies have questioned their use in such cases. See, e. g., Gunderson, Drugs and Psychosocial Treatment of Schizophrenia Revisited, Dec. 1977 Psychiatry Digest 25. Though this Court is in no position to assess the claims that have been averred as to the benefits of the drugs, it can at least be said that psychotropic drugs are an effective method of treating schizophrenic symptoms,[11] and may thus enable patients to benefit from other types of therapy.[12]

Accepting as true the general effectiveness of psychotropic drugs, it is nonetheless clear that they may not be helpful in every case. Further, there is at present neither an accurate method of predicting how a

---

**8.** Of the 15% incapable of making such decisions, few have been found to be "incapable" by some neutral party or tribunal.

**9.** For instance, the major tranquilizers are generally thought not to be addictive while the minor tranquilizers and sedatives often are. For a discussion of the classes of psychotropic drugs see Greenblatt & Shader, Psychotropic Drugs in the General Hospital, in Manual of Psychiatric Therapeutics 1–26 (R. Shader ed. 1975).

**10.** This class also includes prolixin (in both its long–acting form, prolixin decanoate, and short–acting form, prolixin hydrochloride), mellaril, hadol, and trilafon. Both in therapeutic effect and side effect, the drugs in this class are similar, Plotkin, Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment, 72 Nw.U.L.Rev. 461, 475 (1977), and there is no evidence supporting the superiority of any one of these drugs. Bozzuto, Use of Antipsychotic Agents for Schizophrenia, 1977 Drug Therapy 40.

**11.** See generally, Hollister, Choice of Antipsychotic Drugs, 127 Am.J. Psychiatry 104 (1970); May, et al., Schizophrenia–A Follow–up Study of Results of Treatment, 33 Arch.Gen. Psychiatry 474 (1976). But see DuBose, Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits Justify Involuntary Treatment, 60 Minn.L.Rev. 1149 (1976) (not as effective with chronic patients).

**12.** See Winick, Psychotropic Medication and Competence to Stand Trial, 1977 Am.B.Found. Res.J. 769, 781; Comment, Forced Drug Medication of Involuntarily Committed Mental Patients, 20 St. Louis U.L.J. 100, 112 (1975).

patient will react to a particular drug, Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw.U.L.Rev. 461, 475 (1977),[13] nor any accepted criteria for deciding what drug within a particular class and in what amount to prescribe.[14] *Id.* Most disturbing, however, is that *all* antipsychotic drugs can cause side effects which are "as varied and serious as any pharmaceuticals approved for clinical use in the United States." Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych. Rev. 43, 51 (1978).

First, psychotropic drugs can cause a number of muscular side effects (extra pyramidal symptoms). Such side effects take a number of forms. In some patients, psychotropic drugs act as a sedative, and, as some have observed, this effect is one of the most noticed by visitors to mental institutions. Davis & Cole, *Antipsychotic Drugs*, in 5 American Handbook of Psychiatry, 441, 461 (S. Auerti 2nd ed. 1975). Though the extent of drowsiness may vary, it may lead to "severe distress" as a consequence of the patient's desire to feel "wide awake" and "to think more clearly." Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych. Rev. 43, 51 (1978). In other patients, the drugs may have just the opposite effect (akathesia). That is, the patient may experience the inability to sit still, or an irresistible desire to keep walking or tapping the feet. Zander, *Prolixin Decanoate: A Review of the Research*, in 2 Mental Disability L.Rep. 37 (1977); Crane, *Clinical Psychopharmacology in its 20th Year*, 181 Science 124 (1973). Kendler, *A Medical Student's Experience with Akathe-*

sia, 133 Am.J.Psych. 454 (1976). Still other patients may suffer from side effects which mimic those of Parkinson's disease (Parkinsonisms). Such symptoms include a rigidity, a musk–like face, tremors, drooling, and a "ill–rilling" motion with one or both hands. Kline & Angst, *Side Effects of Psychotropic Drugs*, 5 Psychiatric Annals 444, 452 (1975). All of these muscular side effects disappear when the medication is discontinued and can be treated with antiparkinsonian drugs, though such drugs have their own side effects. Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych.Rev. 43, 52 (1978).

Secondly, psychotropic drugs can cause a number of nonmuscular side effects, including blurred vision, dry mouth and throat, weight gain, dizziness, fainting, low blood pressure, depression, and constipation. Denber, *Tranquilizers in Psychiatry*, in Comprehensive Textbook of Psychiatry 1262 (A. Freedman & H. Kaplan eds. 1967); Hollister, *Drug Therapy: Mental Disorders–Antipsychotic and Antimaniac Drugs*, 286 New Eng.J.Med. 984 (1972). Less frequent nonmuscular side effects include skin rash and skin discoloration, cardiovascular changes, and, on occasion, sudden death.[15] *See* Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw.U.L.Rev. 461, 476 (1977). These effects too are thought to be temporary, and often tend to diminish after a few weeks.

Finally, psychotropic drugs can cause a condition called tardive dyskinesia. This condition, which poses the most serious

---

**13.** Indeed, the drug may even exacerbate the symptoms of the disorder for which they are given. *See Note 29, infra.* They may also "inhibit a patient's ability to learn social skills needed to fully recover from psychosis * *." *Rennie v. Klein*, 476 F.Supp. 1294, 1299 (D.N.J. 1979).

**14.** It should be noted that recent studies indicate that in cases in which psychotropic drugs are usually given, the patient can improve just as effectively without as with the drug, and that dosages smaller than traditionally given can also be effective. Crane, *Clinical Psycho-*

*pharmacology in its 20th Year*, 181 Science 124 (1973); Gardos & Cole, *Maintenance Antipsychotic Therapy: Is the Cure Worse than the Disease?*, 133 Am.J. Psychiatry 32 (1976). *See generally*, Carpenter, *et al., The Treatment of Schizophrenia Without Drugs: An Investigation of Some Current Assumptions*, 134 Am.J. Psych. 14 (1977).

**15.** *See also, Rennie v. Klein*, 476 F.Supp. 1294, 1299 (D.N.J.1979) (evidence suggested that drugs may cause cancer).

threat to the patient, is characterized by certain involuntary muscle movements. In most cases, it causes the muscles to produce continual involuntary chewing and lip smacking motions and facial contortions. There may also be involuntary movement of the fingers, hands, legs, and pelvic area. In its most progressive state, the condition interferes with all motor activity, making for instance, speech incomprehensible and breathing and swallowing extremely difficult. Sooner, *et al., Tardive Dyskinesia and Informed Consent*, March 1978 Psychosomatics 173; *Special Section: Tardive Dyskinesia*, 134 Am.J.Psych. 756 (1977); Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw.U.L.Rev. 461, 476–77 (1977). (Symptoms "may be grotesque and socially objectionable, resulting in considerable shame and embarrassment to the victim and his or her family.")

The condition is the subject of much concern for a number of reasons. First, its symptoms are often not manifested until late in the course of treatment and sometimes do not appear until the drug has been discontinued. *Id.* Secondly, the condition is thought to be permanent.[16] Thirdly, though the condition may be associated with length of drug usage, dosage level, and the age and sex of the patient, the condition is not understood and it is impossible to predict who will be a victim. Zander, *Prolixin Decanoate: A Review of the Research*, in 2 Mental Disability L.Rep. 37 (1977); Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych.Rev. 43, 52 (1978). Finally, the condition is fairly widespread. One recent study indicates that the condition affects 50% to 56% of chronically hospitalized schizophrenics, while 41% of all outpatients are affected.[17] Sooner, *et al., Tardive Dyskinesia and Informed Consent*, March 1978 Psychosomatics 173.

## II. Conclusions of Law:

■ A number of courts have held or suggested that persons confined in the State's custody have a constitutional right to refuse "treatment," at least in some situations. *See, e. g., Mackey v. Procunier*, 477 F.2d 877 (9th Cir. 1973); *Knecht v. Gillman*, 488 F.2d 1136 (8th Cir. 1973); *Scott v. Plante*, 532 F.2d 939 (3rd Cir. 1976); *Bell v. Wayne County General Hospital*, 384 F.Supp. 1085, 1100 (E.D.Mich.1974) (three–judge court); *Rennie v. Klein*, 462 F.Supp. 1131 (D.N.J.1978); *Rogers v. Okin*, 478 F.Supp. 1342 (D.Mass.1979). With these courts, this Court notes at the outset its essential agreement with respect to both the existence of the right and the factors which determine its shape. But unlike some of the courts which have derived the right to refuse treatment from the First Amendment, the Eighth Amendment, as well as the "penumbras" and "shadows" of these and the Third, Fourth, and Fifth Amendments, this Court believes the source of the right can best be understood as substantive due process, or phrased differently, as an aspect of "liberty" guaranteed by the due process clause of the Fourteenth Amendment.

The desire to pigeon–hole individual liberties in some specific provision of the Bill of Rights is understandable. As the Supreme Court recently stated:

[t]here are risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights. As the history of the *Lochner* [*Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937] era demonstrates, there is reason for concern least the only limits to such judicial intervention become the predilections of those who happen to be Members of this Court.

---

**16.** It may regress to some extent after discontinuation of treatment, however. Moreover, recent studies have suggested that it can be treated in certain cases. Sooner, *et al., Tardive Dyskinesia and Informed Consent*, March 1978 Psychosomatics 173; Jus, Jus & Fontaine, *Long Term Treatment of Tardive Dyskinesia* 40 J.Clin.Psych. 72 (1979).

**17.** *See also, Rennie v. Klein, supra*, 476 F.Supp. at 1300 (expert evidence suggested 25% to 50% of patients in institutions have the condition).

*Moore v. City of East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977). It is, however, clear that the framers of the Constitution believed that "the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution." *Moore v. City of East Cleveland,* 431 U.S. at 502, 97 S.Ct. at 1937, quoting *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). *See also, Mahoning Women's Center v. Hunter,* 610 F.2d 456 (6th Cir. 1979); 3 J. Story, *Commentaries on the Constitution of the United States* 715–16 (1833); L. Tribe, *American Constitutional Law* § 11–3 (1978); Shattuck, *The True Meaning of the Term "Liberty" in the Clauses in the Federal and State Constitutions which Protect "Life, Liberty, and Property",* 4 Harv.L.Rev. 365 (1891).

The difficult question then is not whether due process is a source of rights not otherwise enumerated in the Constitution; it is instead whether a particular claim of right is entitled to constitutional protection under the due process clause. As suggested, it is not enough that a particular judge deems the right "fundamental." There is nothing unique about constitutional adjudication which permits a judge to ignore the common law tradition that judicial decisions must be reconcilable with those principles fixed by the decisions which precede them. As such, the determination of whether a right is "fundamental" must necessarily begin with an examination of "the teachings of history [and] the recognition of the basic values that underlie our society." *Moore v. City of East Cleveland, supra,* 431 U.S. at 503, 97 S.Ct. at 1937. *See also, id.* at 503 n. 10, 503–04 n. 11, 97 S.Ct. at 1937 nn. 10, 11; *Smith v. Organization of Foster Families,* 431 U.S. 816, 842, 97 S.Ct. 2094, 2108, 53 L.Ed.2d 14 (1977); *Ingraham v. Wright,* 430

U.S. 651, 672–74, 97 S.Ct. 1401, 1413–1414, 51 L.Ed.2d 711 (1977); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973).

*A.*

Plaintiffs have suggested that compulsory treatment, as defined by its administration at LSH, implicates three more or less distinct values recognized by the law. First, compulsory treatment invades a patient's interest in his "bodily integrity" and "personal dignity." Second, compulsory treatment denies the patient's interest in independence in making decisions which are important to the patient. Third, compulsory treatment invades the patient's interest in being able to think and to communicate freely. Each of these interests may not in every situation be equally affected nor may they outweigh in every situation the legitimate interests of the State. For present purposes, however, the important point is that a compulsory drug program does touch in some degree each of these interests[18] and, further, that each of these interests has long been recognized by English and American Law.

In the history of the common law, there is perhaps no right which is older than a person's right to be free from unwarranted personal contact. As early as the middle of the thirteenth century, English law, through the writ of trespass *vi et armis,* provided a method of monetary recovery for unpermitted contacts with the person. F. W. Maitland, *The Forms of Action at Common Law* 40, 43, 53 (1971 ed.). *See generally,* Dreiser, *The Development of Principle in Trespass,* 27 Yale L.J. 220 (1917); Woodbine, *The Origins of the Action of Trespass,* 33 Yale L.J. 799 (1924). Originally, recovery depended upon there having been some act of violence, but at a very early time the action required only a "slight" force and did not depend upon

---

**18.** This is so whether the invasion of the patient's interests is termed "treatment" or something else. That the invasion may be in the name of treatment does not, of course, spare it from constitutional challenge. *See In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527

(1967); *Winters v. Miller,* 446 F.2d 65 (2nd Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *Vann v. Scott,* 467 F.2d 1235 (7th Cir. 1972) (Stevens, J.); *Runnels v. Rosendale,* 499 F.2d 733 (9th Cir. 1974).

whether the touching was done intentionally, negligently, or even accidently. F. W. Maitland, *The Forms of Action at Common Law* at 43; 3 W. S. Holdsworth, *A History of English Law* 376 (1927 ed.). And by the fourteenth century, it was held that trespass would be for any attempted "battery" which had failed to take place. 8 W. S. Holdsworth, *A History of English Law* 424 (1927 ed.).

To be sure, the modern law of battery grew out of a criminal action designed primarily to protect the king's peace. Nonetheless, the "element of personal indignity involved always [was] given considerable weight." W. Prosser, *The Law of Torts* § 9 at 35 (4th ed. 1971). Indeed, as the action developed, the wrong prevented was thought primarily to be "in the violation of the person or the breaking of the close." F. Harper, *A Treatise on the Law of Torts* § 14 at 36 (1933 ed.). It is this interest in the physical security of the person and integrity of the body upon which the modern tort of battery is premised. *Restatement of Torts* §§ 13, 18 (1934); *Restatement (Second) of Torts* §§ 13, 18, 19 (1965); *Cole v. Turner*, 6 Mod.Rep. 149, 87 Eng.Rep. 907 (1704). As such, liability based on battery is not denied because the plaintiff was not aware of the touching. *See, e. g., Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (1891); *Mohr. v. Williams*, 95 Minn. 261, 104 N.W. 12 (1905); *Gregoris v. Manos*, 35 Ohio L.Abs. 279, 40 N.E.2d 466 (1942). Or the touching was beneficial or otherwise harmless. *See, e. g., Lacey v. Laird*, 166 Ohio St. 12, 139 N.E.2d 25 (1956).

But it is not only the law of torts which recognized this interest in the physical security of one's body. It is referred to in the 39th Article of *Magna Carta* and Blackstone identified "the right of personal security" as one of the three elements of "liberty" guaranteed to all Englishmen. Shatluck, *The True Meaning of the Term "Liberty" * * *,* 4 Harv.L.Rev. at 373. Our own constitutional history contains many references to the importance of the "inviolability of the person." As Justice Gray expressed in *Union Pacific Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891):

> [n]o right is held more sacred, or is more carefully guarded * * * than the right of every individual to the possession and control of his own person, free from all restraints on interference of others, unless by clear and unquestionable authority of law.

*See also, id.* at 252, 11 S.Ct. at 1001; *Munn v. Illinois*, 94 U.S. 113, 142, 24 L.Ed. 77 (1876) (Field, J., dissenting). More specifically, a respect for bodily integrity, "as the major locus of separation between the individual and world," L. Tribe, *American Constitutional Law* at 913, underlies the specific constitutional guarantees of the Fourth Amendment, *see, e. g., Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886); *Katz v. United States*, 389 U.S. 347, 351–52, 88 S.Ct. 507, 511–512, 19 L.Ed.2d 576 (1967); *Schmerber v. California*, 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966); *Sibron v. New York*, 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); the Eighth Amendment, *United States v. Georvassilis*, 498 F.2d 883 (6th Cir. 1974); *Aulds v. Foster*, 484 F.2d 945 (5th Cir. 1973); *cf. Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); as well as the due process clauses of the Fifth and Fourteenth Amendments. *See, e. g., Rochin v. California*, 342 U.S. 165, 172, 174, 72 S.Ct. 205, 209–211, 96 L.Ed. 183 (1952); *Ingraham v. Wright*, 430 U.S. 651, 672–74, 97 S.Ct. 1401, 1413–1414, 51 L.Ed.2d 711 (1977).

Closely related to a person's interest in body is his interest in making decisions about his body. In the law of torts, this interest is reflected in the concept of consent. For example, in the context of medical treatment, treatment by a physician in a non–emergency that is rendered without the patient's informed consent, or exceeds the consent given, is actionable as a battery.[19] *See, e. g., Mohr v. Williams*, 95

---

**19.** The common law also recognizes liability for *negligent* failure to obtain consent. *See* W. Prosser, *The Law of Torts* § 32 at 161–65 (4th ed. 1971).

Minn. 261, 104 N.W. 12 (1905); *Pratt v. Davis*, 224 Ill. 300, 79 N.E. 562 (1906); *Rolater v. Strain*, 39 Okl. 572, 137 P. 96 (1913); *Schloendorff v. Society of New York Hospitals*, 211 N.Y. 125, 105 N.E. 92 (1914) (Cardozo, J.); *Wells v. Van Nort*, 100 Ohio St. 101, 125 N.E. 910 (1919). The principle which supports the doctrine of informed consent is that only the patient has the right to weigh the risks attending the particular treatment and decide for himself what course of action is best suited for him.[20]

> The very foundation of the doctrine of [informed consent] is every man's right to forego treatment or even cure if it entails what *for him* are intolerable consequences or risks, however warped or perverted his sense of values may be in the eyes of the medical profession, or even of the community, so long as any distortion falls short of what the law regards as incompetency. Individual freedom here is guaranteed only if people are given the right to make choices which would generally be regarded as foolish.

2 F. Harper & F. James, Jr., *The Law of Torts* 61 (1968 Supp.) (emphasis in original). *See also, Cobbs v. Grant*, 8 Cal.3rd 229, 104 Cal.Rptr. 505, 514, 502 P.2d 1, 10 (1972); *Schloendorff v. Society of New York Hospitals, supra*, 105 N.E. at 93.

This rationale applies equally to a number of decisions which a person is constitutionally entitled to make. It is not the State, acting in what it deems to be the individual's best interests, which decides whether a criminal defendant will or will not be represented by a lawyer. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

> The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is, therefore, the defendant who must be free personally to decide whether in this particular case counsel is to his advantage. And although he may conduct his own defense

ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the life-blood of the law."

*Id.* at 834, 95 S.Ct. at 2541, *quoting Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064–1065, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring). Neither a lawyer or the State can make the decision for the criminal defendant whether to testify or not in his own defense. *See Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). Similarly, where the option is available, the criminal defendant must decide whether his trial will be before the court or before a jury, *Adams v. United States ex rel. McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942); *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). And it is the criminal defendant who must decide whether, by accepting a plea of guilty, there will be a trial at all. *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976); *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

It not only is criminal defendants whose "interest in making certain kinds of personal decisions" is constitutionally protected. *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–877, 51 L.Ed.2d 64 (1977). *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Allgeyer v. Louisiana*, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897). To be sure, these decisions may not require a constitutional right to refuse psychotropic drugs. But each reaffirms the

---

**20.** This justification holds true only where the patient is competent to make the decision, in the sense that the patient is capable of providing consent. *See* W. Prosser, *The Law of Torts* § 18 at 102–103 (4th ed. 1971).

principle that the constitution recognizes the individual's right to make intimate decisions which fundamentally affect the individual. *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972).[21]

Aside from a person's interest in "physical security" and in making decisions about how his body will be used or abused, the forced administration of psychotropic drugs implicates a person's interest in being able to think and to communicate freely. The notion that the State cannot punish or deprive a person because of his thought or beliefs has long been beyond dispute. "The fantasies of a drug addict are his own, and beyond the reach of the state." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973). Though it is at least arguable that "treatment" at LSH has on occasion been administered for no purpose other than to punish inmates for their thoughts, the inmates' principal interest affected in the present case arises not from the State's attempts to punish thoughts but its attempts to use treatment as a means of controlling thought, either by inhibiting an inmate's ability to think or by coercing acceptance of particular thoughts and beliefs.

It has been suggested that the First Amendment guarantee of freedom of speech protects, in addition to a person's interest in communicating, a person's interest in thinking without regard to the subject matter of his thoughts. *See, e.g., Mackey v. Procunier*, 477 F.2d 877 (9th Cir. 1973); *Scott v. Plante*, 532 F.2d 939 (3rd Cir. 1976); *Karmowitz v. Department of Mental Health*, Civil No. 73–19434–AW (Wayne County Mich.Cir.Ct.1973), *reprinted in* 2 Prison L.Rptr. 443 (1973); Shapiro, *Legislating the Control of Behavior Control: Autonomy and the Coercive Use of Organic Therapies*, 47 S.Cal.L.Rev. 237 (1974). Under this view, government action which directly affects the mental processes would be unconstitutional under the First Amendment. There are decisions by the Supreme Court which would support this view. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1964); *Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); *United States v. Reidel*, 402 U.S. 351, 359, 91 S.Ct. 1410, 1414, 28 L.Ed.2d 813 (1971) (Harlan, J., concurring). But this Court need not rest the protection of a person's interest in being free to use his mind as he so desires on the First Amendment. It is enough to observe that "the power to control men's minds" is "wholly inconsistent" not only with the "philosophy of the first amendment but with virtually any concept of liberty." *Stanley v. Georgia, supra*, 394 U.S. at 565–66, 89 S.Ct. at 1248. "[I]n a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood v. Detroit Board of Education*, 431 U.S. 209, 235, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977). Indeed, the State's power to control the minds of its subjects is the hallmark of those "totalitarian ideologies we profess to hate * * *." *Sobell v. Reed*, 327 F.Supp. 1294, 1305 (S.D.N.Y.1971).[22]

---

**21.** It indeed "would be a very curious and unsatisfactory result, if * * * a provision of constitutional law, always understood to have been adopted for protection and security of the right of the individual as against the government," *Pumpelly v. Green Bay Company*, 13 Wall. (80 U.S.) 166, 20 L.Ed. 557 (1871), neither recognized the individual's interest in security nor, more importantly, his interest in being an individual. Perhaps no action directly affects this latter interest more than the State's attempt to decide for the patient whether he must take psychotropic drugs. If a patient has no protected interest in his body, in how his body will be used, and how his mind will work, in almost every sense of the word the patient ceases to be an individual and instead becomes a creature of the State. Only when a person is granted a certain sphere of autonomy does that person become an individual.

**22.** *See also, id.* at n. 12, *citing* J. Cohen, *The Criminal Process in the Peoples Republic of China* 256 (1968). One need not resort to the practices of the modern world's more advanced totalitarian states to find evidence of how the power to control men's minds will lead to its exercise. Men of good intentions and products of the freeist societies have openly suggested how to use psychiatric treatments to accomplish ends not dissimilar to those in Antony Burgess' *A Clockwork Orange. See* Breggin, *Psychosurgery for Political Purposes*, 13 Duq.L.

B.

Recognition of the interests discussed in the preceding section as fundamental and worthy of constitutional protection does not, *ipso facto*, mean that plaintiffs have a right to refuse psychotropic medication. Whether any such right exists, and if so, its limitations can be determined only after identifying the legitimate interests of the State and then balancing these interests against the interests of the plaintiffs. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The State advances various interests as weighing against recognition of a constitutional right to refuse psychotropic medication. These interests are discussed *seriatim*.

The State suggests that forced medication may at times be necessary to protect a patient from harming himself or others. That the State has a legitimate interest in protecting patients at LSH is beyond question. *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). *See also, Runnels v. Rosendale*, 499 F.2d 733, 735 (9th Cir. 1974); *Goodman v. Parwatikar*, 570 F.2d 801, 804 (8th Cir. 1978) (State has constitutional obligation to protect prisoners in its custody against assaults by other prisoners). As the Supreme Court long ago stated in *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905):

There is, of course, a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members, the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint * * * as the safety of the general public may demand * * *.

It is, therefore, not true that the power of the public to guard against imminent danger depends in every case involving the control of one's body upon his willingness to submit to reasonable regulations established by the constituted authorities * * * for the purpose of protecting the public collectively against such danger. *Id.* at 29–30, 25 S.Ct. at 362–363; *see also, Buck v. Bell*, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). None of the parties to the instant action, however, have challenged forced treatment where necessary to protect the safety of others, particularly in an emergency. As such, the question presented in the instant action does not concern the State's power to "treat" a patient against his will to protect the LSH community; it instead concerns the question of when the danger of injury to himself or others is sufficient to justify a "forced injection of a mind–altering drug into the buttocks of a competent patient unwilling to give informed consent." *Rogers v. Okin, supra*, 478 F.Supp. at 1369.

Given the significant invasion of fundamental interests that the forced use of psychotropic drugs represents, the risk of danger which the State has a legitimate interest in protecting against must be sufficiently grave and imminent to permit their coerced use.[23] The focus must therefore be in the first instance on the existence of danger, not merely the remote possibility, to others, since it is this which justifies the coercive power of the State. Accordingly,

Rev. 841 (1975); J. Delgado, *Physical Control of the Mind–Towards a Psychocivilized Society* (1969).

**23.** This inquiry assumes that the use of psychotropic drugs is rationally related to the legitimate State interest sought to be furthered, *i.e.*, that such drugs are effective in reducing the degree of violent behavior. This assumption, however, does not apply in all cases, and indeed may even increase the danger sought to be avoided. *See, e.g.*, Zander, *Prolixin Decanoate: A Review of the Research, reprinted in* 2 Mental Disability L.Rep. 37 (1977). Thus, while drugs have proven effective often enough that their effectiveness in any particular case can be presumed, the Court believes that the patient should be given an opportunity to rebut this presumption in any hearing to determine whether to treat the patient over his will.

it is not enough that the patient has at some time been violent. Many, if not most, of the patients at LSH have exhibited violent tendencies and this has justified their separation from the society outside the institution. *O'Connor v. Donaldson*, 422 U.S. 563, 575–77, 95 S.Ct. 2486, 2493–2495, 45 L.Ed.2d 396 (1975). But the same holds true for a good many of the inmates in the jails and prisons of Ohio. Like the patients at LSH, these persons too could be sufficiently drugged to prevent all possibility of their being violent while in the State's custody. Yet, there can be no doubt that the State's power stops short of this, not because the State's purpose for acting is improper but because the method chosen sweeps too broadly. As a constitutional minimum, therefore, the State must have at least probable cause to believe that the patient is *presently* violent or self–destructive, and in such condition presents a present danger to himself, other patients or the institution's staff before it may disregard the patient's interests in refusing treatment.[24] Admittedly, the tools at the State's disposal with which to predict dangerousness are imperfect. Schoenfeld, *Recent Developments in the Law Concerning the Mentally Ill–"A Corner–Stone of Legal Structure Laid in Mud"*, 9 U.Tol.L. Rev. 1, 6–7 (1977). But where the best evidence available indicates that the safety of others is in fact threatened, this Court cannot conclude that the interests of the dangerous patient outweigh the interests of the State in protecting the life and limb of those threatened.

The State also seeks to justify compulsory treatment under its *parens patriae* powers. This Court does not question the State's long–established interest in "providing care to its citizens who are unable because of emotional disorders to care for themselves.[25] *Addington v. Texas*, 441 U.S. at 426, 99 S.Ct. at 1809. What the Court does reject is the State's assumption that its *parens patriae* power enables the State to drug *all* persons who are mentally ill and confined in an institution.

The State's *parens patriae* powers are, by definition, conditioned upon the patient's abilities to care for himself. As the State itself suggests, the power of the State to drug a patient at LSH depends upon whether he is capable of making decisions which affect his fundamental interests.

As this Court has already observed, the overwhelming majority of the patients at LSH are quite capable of rationally deciding whether it is in their best interests to take or to stop taking psychotropic drugs. This fact, of course, should not be surprising. Plaintiffs have been institutionalized for reasons other than that they are unable to care for themselves. Though they may each suffer from emotional disorders, there is no necessary relationship between mental illness and incompetency which renders them unable to provide informed consent to medical treatment. *Scott v. Plante*, 532 F.2d 939 (3rd Cir. 1976); Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 Nw.U.L. Rev. 461, 490, 496 (1977).[26] Consequently, mental illness, by itself, is "no basis for compelled treatment and surely none for confinement." *Addington v. Texas, supra,*

---

**24.** This, of course, does not mean that the patient found dangerous must be drugged or can be drugged excessively. These questions, however, concern the State's obligation to provide the least restrictive treatment and are not considered here.

**25.** The State's power of *parens patriae* can be traced as far back as the early fourteenth century and the passage of *De Praerogtive Regis*, 17 Edw. § 2, c. 9 (1324), which made the king guardian over those persons found by a jury of twelve to be idiots or lunatics. The actual care of such persons, however, was left to friends or relatives, *see* Regan, *Protective Services for the*

*Elderly: Commitment, Guardianship, and Alternatives*, 13 Wm. & Mary L.Rev. 596, 571 (1972).

**26.** This fact is reflected in Ohio Revised Code § 5122.271. By providing patients in state institutions the right to refuse certain types of treatment, the statute recognizes that, unless there is a determination otherwise, the patient is capable of making treatment decisions for himself. In other words, Ohio law recognizes that institutionalization does not represent a determination of incompetency.

441 U.S. at 427, 99 S.Ct. at 1810. Thus, in the instant case, the fact that a patient is in LSH cannot justify the forced drugging of that patient for the purpose of "doing good" *absent* a determination that the patient is not capable of rationally deciding what is good for himself.[27]

There are a number of factors which this Court believes mitigates against administering antipsychotic drugs against a patient's will without regard to any general limitations on the State's power to care for its citizens. As this Court has already observed, the forced use of psychotropic drugs represents a significant encroachment upon the patient's fundamental interests. These drugs quite often cause pain and serious, long–term, if not permanent, side effects. They deaden the patient's ability to think and their forced administration is an affront to basic concepts of human dignity. If the Constitution tolerates such intrusions, it certainly requires that the intrusions substantially serve their intended purpose.

Research suggests there is little justification in ignoring the patient's refusal to take psychotropic drugs. As two researchers have found:

the subjective response very early in chlorpromozine [a psychotropic] treatment may predict, to a moderate degree, the symptomatic outcome after a sustained course of treatment with the drug * * * schizophrenics have been asked every question except, "How does the medication agree with you?" Their response is worth listening to.

Van Putten & Ray, *Subjective Response as a Predictor of Outcome in Pharmacotherapy*, 35 Arch.Gen. Psychiatry 477, 478–80 (1978).[28] Moreover, though psychotropic drugs can effectively control symptoms, their therapeutic value depends upon the existence of a "trusting relationship * * between psychiatrist and patient * * *." *Rennie v. Klein, supra*, 462 F.Supp. at 1141. "[P]sychotropic drugs are less efficacious in a hostile or negative environment. As a corollary to this, even if the best drug is prescribed, if the patient is unwilling to accept it, the positive effects are greatly lessened, especially in terms of long range benefits." *Id. See also, O'Connor v. Donaldson, supra*, 422 U.S. at 579, 95 S.Ct. at 2495 (Burger, C. J., concurring). The importance of this, as earlier noted, is that psychotropic drugs *do not by themselves*

---

27. This conclusion is suggested by the Supreme Court's decision in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Though the decision did not answer the question of involuntary confinement for the purpose of *treating* a condition that poses no risk of dangerous behavior, *State ex rel. Hawks v. Lazaro*, 202 S.E.2d 109 (W.Va.1974), the Court did hold that, as a matter of substantive due process, the State cannot confine someone involuntarily if the individual endangers neither himself nor others and receives no medical treatment for his "mental illness." For present purposes, the important aspect of the decision is the meaning of the term "danger." As to this issue, the Court held that the State cannot "confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community" and, most importantly, the State may not "fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different." *Id.* 422 U.S. at 575, 95 S.Ct. at 2494.

In the present case, there is no question but that some of the patients at LSH pose a danger to society, and the State is thus justified in removing the danger from the community. Having been institutionalized, they no longer

present a danger to society and, indeed, may not present a danger to those in the institution. To the extent this is true, *O'Connor* suggests that such patients cannot further be deprived of constitutionally protected interests by treating the symptoms of an illness with drugs merely because the symptoms of the illness are strange and eccentric behavior. In other words, if not dangerous, something *more* than the fact of mental illness is required before the State may ignore the patient's interests. This something else, the Court believes, is that the patient is not capable of taking care of himself. *See Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979) (one of the reasons minors do not enjoy all constitutional rights of adults is because of their "inability to make critical decisions in an informed, mature manner").

28. It is interesting to note that patients usually refuse drugs because of the side effects, and that these side effects often go unnoticed by the physician. Van Putten, *Why Do Schizophrenic Patients Refuse to Take Their Drugs?*, 31 Arch.Gen. Psychiatry 67, 70, 71 (1974).

cure mental illness, and there is "virtually no evidence that * * * [they] have a beneficial effect upon patients beyond the time they are in the blood stream." [29] Gaughan & LaRue, *The Right of Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych.Rev. 43, 48 (1978). Further, even the value of psychotropic drugs as a means of controlling symptoms of mental illness (as opposed to their use as a cure for such disorders) often depends, in any particular case, upon the accuracy of the diagnosis as to what disorder the patient suffers from,[30] *see Rennie v. Klein, supra*, 426 F.Supp. at 1139, and there is wide recognition that such diagnosis is a less than precise art. *See O'Connor v. Donaldson*, 422 U.S. at 584, 95 S.Ct. at 2498 (1975) (Burger, C. J., concurring); *Blocker v. United States*, 288 F.2d 853, 860 (D.C.Cir. 1961) (Burger, J., concurring); Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Calif.L.Rev. 693 (1974). *See also*, Lehmann, *Psychopharmacological Treatment of Schizophrenia*, 13 Schizophrenia Bull. 27 (1975) (schizophrenia overdiagnosed).

Weighing these factors against the State's interest in providing care for its citizens, the Court must conclude that the *parens patriae* powers of the State do not include the compulsory administration of psychotropic medication to all persons confined in institutions for the mentally ill without limitation.

The State has also attempted to justify the involuntary treatment with psychotropic drugs on the grounds that it has a legitimate interest in maintaining its institution in the cheapest and most efficient manner possible. Granting the legitimacy of this interest, this Court rejects the argument that it justifies compelled treatment with psychotropic drugs. *Watson v. City of Memphis*, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963):

> [T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might say of the Bill of Rights in general * * * that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

*Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972). Further, this Court is not persuaded that recognition of a limited right to refuse treatment will interfere with the State's interest in allowing doctors to do their work without unreasonable State intrusions. Many of the doctors who testified in this case indicated that patients should have a right to refuse psychotropic drugs,[31] *see also, Rogers v. Okin, supra*, 478 F.Supp. at 1370. Indeed, this appears to be the view of the American Psychiatric Association. *See American Psychiatric Association Task Force on the Right to Treatment*, 134 Am.J. Psych. 3 (1977) ("As is the practice general-

---

**29.** They may even cause psychiatric deterioration. Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych.Rev. 43, 54 (1978). *See also*, Zander, *Prolixin Decanoate: A Review of the Research, reprinted in* 2 Mental Disability, L.Rep. 37 (1977).

**30.** The use of psychotropic drugs may even make the task of diagnosis more difficult by masking symptoms. Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 Law & Psych. Rev. 43, 54 (1978). But even given an accurate diagnosis, in making a prediction of drug efficacy:

> the physician has the benefit of very little meaningful research on those types of pa-

tients for whom antipsychotic drugs are most likely to provide effective symptomatic control. Psychiatric expertise on the length of drug maintenance is also limited. Even under the best of conditions, it is difficult for a psychiatrist to predict the patients for whom drugs will not be effective and those for whom drugs would no longer be effective. *Id.* at 54.

**31.** Further, there was testimony as to the recognition of the right to refuse treatment in other institutions, most notably federal institutions, but nothing which would suggest that recognition of the right has had any adverse effects on the operation of the institution or on its treatment goals.

ly in medicine, the patient's informed consent for treatment is required except for emergency situations").

■ In short, this Court concludes that neither the State's obligation to provide treatment, its interest in caring for its citizens, its interest in protecting the safety of its charges, nor any other of its legitimate interests justifies the State's administration of psychotropic drugs absent the informed consent of the competent patient unless the patient presents a danger to himself or others in the institution.[32]

C.

■ Since the right to refuse psychotropic drugs is not absolute, the Constitution does not preclude the State's use of a compulsory drug program for some patients. Yet, for the reasons which give rise to a limited right to refuse drug treatment, it should be clear from the preceding section that any such program implicates a patient's constitutionally protected liberty interest in not being treated against his will. Accordingly, the procedures by which the State determines whether a particular patient can be treated involuntarily with psychotropic drugs must satisfy the procedural protections of Fourteenth Amendment due process.

As the Supreme Court has repeatedly emphasized, due process is a flexible concept and the question of what process is due varies with the context in which the question is asked. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960). Nonetheless, the "identification of the specific dictates of due process" requires in each case consideration of the three factors set out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

First, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903. What procedural protections the application of these principles require, however, has not been addressed by any of the parties to the instant action, and without benefit of counsel's arguments, this Court is simply in no position to decide the question. Therefore, without deciding what process is due, this Court offers certain general observations on the question as a guide to the parties.

First, on the present record, this Court believes the State should provide the patient with some kind of hearing before com-

---

**32.** That the State's power to treat in certain circumstances a patient with psychotropic drugs depends upon the patient's informed consent to the treatment follows from two sources. First, it is implicit in the protection of the patient's fundamental interest in making important and intimate decisions. Secondly, the right reflects the patient's interest in *not* being subjected to unreasonable physical intrusions and direct interference with the patient's mental processes. As with all fundamental interests, these interests can be validly waived only if the waiver is voluntary, knowing, intelligent, and done with "sufficient awareness of the relevant circumstances and likely consequences." L. Tribe, *American Constitutional Law* § 10–18 at 557, *quoting Brady v. Maryland*, 397 U.S. 742, 747, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970).

This Court notes further that it does not believe the recognition of a limited right to refuse psychotropic drugs is inconsistent with the Supreme Court's Decision in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). To be sure, the Court in *Vitek* indicated that one of the reasons supporting application of Fourteenth Amendment due process procedures to the transfer of a prisoner to a mental institution was that he would there be subjected to involuntary treatment. But, the issue of whether a mental patient had any right to refuse psychotropic drugs was not before the Court, and the Court specifically noted that the treatment program to which the prisoner would be subjected was "mandatory behavior modification."

pelling the patient to take psychotropic drugs. A prior hearing is suggested by a number of factors. First, once psychotropic drugs have been administered, the patient's interests which have been deprived cannot adequately be vindicated. Though this alone may not require a prior hearing, *see e.g., Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), it presents a powerful argument for such a requirement given the serious and possibly permanent effects that a deprivation might cause. Further, unlike the situation in *Ingraham*, this is not a case in which the Court can say that "[i]n view of the low incidence of abuse, the openness of the [institution], and the common law safeguards that already exist, the risk of error that may result in violations of a [patient's] substantial rights can be regarded as minimal." *Id.* at 682, 97 S.Ct. at 1418.

While a prior hearing may be required in most circumstances, it certainly is not required in all. Due process, for instance, has generally not required the State to conduct a prior hearing when confronted with an emergency. *See, e.g., Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908); *Goss v. Lopez*, 419 U.S. 565, 582–83, 95 S.Ct. 729, 740–741, 42 L.Ed.2d 725 (1975). Where the patient thus presents an immediate danger to himself or others, the State may immediately deal with the danger as long as notice and a hearing follow as soon as possible. Finally, the Court notes that once the State has conducted a hearing and decided that the patient may be treated against his will, due

process may require the State to periodically review that decision.

Separate from the question of when a hearing must be held is the question of what form the hearing must take. Due process, of course, requires an impartial decision–maker, but the Court does not believe that this means the decision–maker must be a judge or even a lawyer.[33] Indeed, due process may not require that the decision–maker be from outside the institution, *see Parham v. J. R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Secretary of Public Welfare v. Institutionalized Juveniles*, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979), though there might be good reasons for why he should be.[34] *See also*, the Court's discussion at pp. 66–69 of the *Opinion and Order* of September 28, 1978.

Beyond these basic concerns, the Court expresses no view as to the time, formality, and content of the hearing required under the due process clause. As mentioned, the parties to the action should in the first instance be allowed to present their views. The parties are currently preparing memoranda, at the direction of the Special Master, addressed to the issue of what process is due when other liberty interests are infringed. The parties are hereby directed to incorporate therein discussion of those procedures required to assure procedural due process prior to the forced administration of medication. In addition, the State shall also formulate procedures to implement the right to refuse treatment defined above. The plaintiffs and the United States will then be granted fifteen (15) days to submit any objections they might have to the State's suggested procedures.

33. This is true even where the question is whether or not the patient is competent to refuse drugs. Full–scale competency proceedings not only would deprive the patient of interests not connected with the decision of whether to take psychotropic drugs (e. g., his ability to pass property, or make a will), but would be unnecessarily expensive and burdensome.

34. For instance, in § 5122.271 of the Ohio Revised Code, the Ohio legislature suggests that a person or persons from the institution are not

capable of providing an impartial review, and this determination is of some importance. *See* L. Tribe, *American Constitutional Law* § 10–13 at 572. Further, the decision that a particular patient can be medicated may not foster to the same degree that patient's distrust of his doctor (which would therefore affect the relationship between patient and doctor which is essential to the patient's recovery) if the decision is from a person or body outside the institution.

*ISSUE 19: WHETHER THE POLICIES AND PRACTICES WITH REGARD TO RESTRAINTS AND SECLUSIONS AT LIMA STATE HOSPITAL ARE CONSTITUTIONALLY PROSCRIBED.*

*ISSUE 21: WHETHER IT IS A VIOLATION OF THE FOURTEENTH AMENDMENT TO PERMIT TELEPHONE ORDERS FOR MEDICATION, ISOLATION, RESTRAINT, SECLUSION OR LOSS OF PRIVILEGES TO BE MADE BY DOCTORS OR MEDICAL ASSISTANTS, ON CALL, WITHOUT PRIOR EXAMINATION OF THE PATIENT INVOLVED.*

The "restraint"[35] of patients at LSH is achieved by three (3) means:

(1) Restraints, which include:

(a) Manual restraint: The physical holding of a patient during a crisis situation until an appropriate apparatus or device may be applied to prevent him from injuring himself or others.

(b) Mechanical restraint: Any device or apparatus that interferes with the free movement of a patient and which the patient cannot remove easily.

(1) Types of acceptable mechanical restraints:

*Soft tie*: Any cloth tie which prevents movement of a patient.

*Mittens*: Mittens without thumbs which are securely fastened around the wrist with a small tie.

*Restraining sheet*: Wide piece of muslin or sheet placed over the body of the patient.

*Tie jacket*: Sleeveless cloth jacket fastened in the back with ties to keep the patient in a chair or bed or from injuring himself.

*Well–padded leather belt and cuffs*: Shall be used as a temporary emergency measure to control a seriously disturbed, assaultive patient and shall only be maintained until medical and/or other restraint procedures can be substituted.

*Wristlets*: Shall be used as a restraining device for transport of patients from one institution to another.

*Straight jacket*: Jacket with sleeves that are stitched together with tie strings to be tied behind patient's back.

(2) Seclusion, including:

(a) Seclusion room: A room with locked door which patient is unable to open from the inside.

(b) Quiet room: A room which is never locked and which shall be used to meet the physical and mental needs of the patient.

and,

(3) Medical restraint:

Administering a narcotic, sedative, or antipsychotic drug, which is in keeping with medical needs of the patient, to inhibit, control, or limit behavior.

*See* Executive Order No. G–3, Stips., App.C.

The policy statement of the Department of Mental Health and Retardation provides:

Restraints shall be used only in emergency situations. Restraints shall be employed only when all other measures have failed; use of restraints shall be to protect the patient from injuring himself or other persons. If a patient is seriously enough disturbed to justify the use of restraints, full emergency attention of the medical, nursing, and security staff shall also be utilized. Restraints shall never be used as punishment or as a substitute for more effective medical and nursing care programs.

*Id.*[36]

Executive Order G–3 provides the following procedures for ordering restraint:

---

**35.** "Restraint" means inhibiting, controlling, or limiting the behavior of a patient. *See* Ohio Department of Mental Health and Retardation Executive Order No. G–3, effective April 21, 1972, Stips., App.C.

**36.** Ohio Revised Code § 5122.28, subsequently amended, provided,

*Restraints shall not be applied to a patient unless it is determined by the head of the hospital or a member of the medical staff to be required by the medical needs of the pa-*

Behavior and seclusion restraint, except in crisis situations, must be properly ordered by a physician and the physician shall personally attend to the patient prior to writing such orders. In crisis situations aggressive, assaultive, acutely disturbed or severely confused patients may be restrained without a physician's order; however, a physician shall be contacted immediately for proper orders. The Doctor's Orders Form ... shall be signed within the physician's tour of duty. Physician's orders for behavior restraint or seclusion restraint shall be reviewed and renewed every twenty–four (24) hours. Medical, supportive, treatment, and diagnostic restraints shall be used whenever necessary by the nursing care staff on a physician's order. When a restraint is ordered, more intensive nursing care is necessary to assure the patient of adequate feeding, fluids, toileting, exercise, and personal hygiene. Suicidal patients shall be carefully checked by nursing personnel at least every fifteen (15) minutes and such observations shall be recorded and initialed by the person who sees the patient. All other patients in restraint shall be checked at least every thirty (30) minutes by nursing personnel and more frequently if the condition of the patient indicates the need for closer attention. These observations shall be recorded and initialed by the observer at the time noted on each occasion the patient is seen. These records shall be kept at the door of the patient's room or in an appropriate place on the ward. All patients in mechanical restraint or seclusion restraint shall be loosened or freed every two (2) hours for ambulation or personal and nursing care. Observations at this time shall be recorded in the nursing notes of the clinical record.

The Order further states:

C. The final authority and responsibility for the use of restraints rests with the Managing Officer or members of the medical staff. Nursing and an-

cillary medical staff may place a patient in restraint in an emergency in accordance with written instructions of the Managing Officer or members of the medical staff, or Executive Order No. G–2. Orders for, and recording of, restraints shall meet the requirements outlined below in order to insure the highest standards of patient care. The specific kind of restraint, length of time, and reason(s) for same shall be an integral part of any order. Each patient shall be removed from restraints as quickly as his condition warrants.

Regrettably, the evidence before the Court compels the conclusion that Executive Order G–3 is honored only in the breach at LSH.

The expert witnesses who addressed the issue were uniform in their conclusion that the records of the institution demonstrated unusually high levels of use of seclusion, restraints and psychotropic medication. Clark Depo. at p. 83. Report of Dr. Brelje, Stp., App. G. (The use of psychotropic medication is more fully discussed at pp. 926 to 929, *supra*.) These witnesses further found that the orders for seclusion and/or restraints were generally inadequate in providing clear documentation of need for such action. By way of example, Dr. Brelje cited one instance where the records indicated that a patient was placed in seclusion for *two* weeks because he was "restless, noisy, destructive and dirty." *Id.,* App. G. This evidence is wholly inconsistent with the mandate of Executive Order No. G–3 that "Restraints shall never be used as punishment or as a substitute for more effective medical and nursing care programs."

The record strongly suggests that most decisions to restrain or seclude patients are actually made by the attendant staff. Indeed, decisions regarding medication may be made upon the recommendation of the

*tient.* Each use of restraint and the reasons therefore shall be made a part of the clinical record of the patient under the signature of

the head of the hospital or a member of the medical staff. (Emphasis added.)

attendant staff, with no examination made by the physician. Stip. 291. It would also appear that the attendant staff determines when the patient is to be released from seclusion or restraints, and how they will be treated while secluded or restrained. *See* Stip. 233, 234, 275, and 320. Indeed, Dr. Kenneth D. Gaver, then Director of the Ohio Department of Mental Health and Retardation, conceded that "practical problems" such as manpower shortages at LSH had resulted in routine violation of the Order's requirements of physician evaluation of patients prior to or immediately after restraint,[37] regular and periodic checks of patients, and periodic loosening of restraints. *See* Gaver Depo. at 153–57. *See also* Tr. at p. 332; Stip. 80, 233, 234, 274 and 320. The absence of medical staff in the hospital to attend to the patient before prescribing medication is overcome by permitting nurses to obtain physician approval by phone. Stip. 287. While the physician is expected to countersign within twenty–four (24) hours, even this policy is routinely violated. Stip. 233, 287. More disturbingly, the physician is not expected to actually attend the patient prior to countersigning orders for seclusion, restraints *or medication.* Gaver Depo. at p. 156. *See also* Tr. 447–48, Stip. 287. Such seclusion and restraint orders may run for thirty (30) days. *Id.*

The record further reveals that the conditions of confinement during seclusion and restraint are shockingly inhumane. Showers are permitted only twice per week. Stip. 234. Allegedly due to staff shortages, patients are not regularly released for personal hygiene purposes, not infrequently forcing the patient to defecate the bed. Stip. 234, 274, 320. Instances were established where patients were secluded only in underwear, or occasionally naked. Stip. 274. During periods of seclusion or restraint patients do not have access to workers from the Social Services Department,

including social workers, Stip. 152, and have infrequent contact with the professional or non–professional staff.

One other practice with respect to medication requires comment. It appears that "PRN" orders for medication are written which permit either the attendant staff or the patient himself to decide when oral medication should be taken. Stip. 236. A "PRN" order will not always have a termination or review date. Stip. 288. Further, attendants reportedly are able to obtain additional medication from the pharmacy by simply submitting appropriate forms *without* a physician's signature. Stip. 233, 291.

## CONCLUSIONS OF LAW

■ Based upon the above findings, the Court is compelled to accept plaintiffs' contention that the manner in which defendants use restraints, seclusion and psychotropic medication as "restraint" is a violation of the plaintiffs' rights as secured by the Fourteenth Amendment. Specifically, the Court finds that the actual practices of the institution relative to the imposition of restraint, in all forms, as well as the conditions of restraint and seclusion, are so arbitrary, inhumane and countertherapeutic as to violate plaintiffs' right to treatment in a humane therapeutic environment.[38] This conclusion is, of course, wholly consistent with the Court's earlier ruling that orders for restraints, seclusion and increases in medication infringe the patient's protected liberty interests, and therefore may not be imposed without affording minimum procedural due process safeguards. See *Opinion and Order,* September 28, 1978, pp. 59 to 65. In addition to the cases cited therein, *see Rogers v. Okin,* 478 F.Supp. 1342 (D.Mass. 1979).

Thus, the issue becomes what procedural safeguards must be afforded. In their brief, defendants submit that actual compli-

---

**37.** It is ironic to note that while patients are routinely "restrained" without medical consultation, patients may remain restrained or secluded an extra twenty–four (24) hours because of the unavailability of a physician to sign a release. *See* Report of Dr. Clark, p. 4, Stip., App. H.

**38.** The practices at LSH are also clearly violative of Revised Code § 5122.28.

ance with Executive Order G–3 would satisfy all constitutional standards, and urge the Court to do no more than enjoin defendants to comply therewith. Plaintiffs contend that Executive Order G–3 is inadequate in certain respects and ask the Court to impose further safeguards.[39]

The Court notes that since this issue was briefed the Ohio Department of Mental Health and Mental Retardation has superceded Executive Order G–3 with Rule 5119–3–04 entitled "Restraint of Clients". Said Rule incorporates a number of the remedial safeguards advocated by plaintiffs, but falls short in other respects. Having carefully studied Rule 5119–3–04 and the relevant expert testimony herein,[40] the Court hereby finds the following safeguards to be constitutional minimums:

I. Except in a crisis situation, defined as one wherein the behavior of the patient places him or others in real and imminent fear of physical harm, no patient may be restrained or secluded except on the written order of a qualified mental health professional who has personally examined the patient prior to such order. The order, which shall be made part of the patient's record, must describe the patient's behavior in nonconclusory language, and must specify the alternatives to seclusion or restraint which were considered, and state why such alternatives were found to be inappropriate. The order for seclusion or restraint must specify its duration, and in no event may an order exceed twelve (12) hours. Said order may only be renewed if the patient is examined by a qualified mental health professional, and the conditions requiring extension of the order expressly noted on the patient's record. In those instances where the qualified mental health professional placing the patient in seclusion or restraint is not a psychiatrist, the order

for seclusion or restraint must be countersigned by a psychiatrist within two (2) hours and the countersignature must indicate that the patient has in fact been attended by the psychiatrist.

II. In a crisis situation, an aggressive acutely disturbed, or severely confused patient may be restrained or secluded without a written qualified mental health professional's order only if the following requirements are met:

A. A qualified mental health professional shall be immediately contacted by a registered nurse who shall describe to the qualified mental health professional in detail the conduct requiring seclusion or restraint.

B. The qualified mental health professional shall personally evaluate the patient within forty–five (45) minutes to determine the appropriateness of the measures used and to write the necessary documentation as outlined above.

III. Patients in restraint or seclusion shall be afforded personal hygiene opportunities upon the patient's request.

IV. Patients in restraint or seclusion shall be afforded bathing opportunities upon demand, but at least once every twelve (12) hours.

V. Except in a crisis situation, no medication or increases in medication may be administered to a patient except upon a written order of a licensed physician.

VI. In a crisis situation, an aggressive, acutely disturbed, or severely confused client may be administered a "chemical" restraint as defined in Ohio Department of Mental Health and Mental Retardation Rule 5119–3–04(E)(1)(b), without a written psychiatrist's order, only if the following requirements are met:

A. A psychiatrist shall be contacted immediately by a registered nurse who shall describe in detail to the psychiatrist the conditions which require chem-

---

**39.** The arguments in favor of and contra plaintiffs' claim that patients "must be given an opportunity to protest the proposed imposition of a restraint" were previously addressed and resolved and will not be considered further herein. *See Order and Opinion*, September 28, 1978, pp. 65 to 68.

**40.** The Court relies primarily upon the expert testimony of Dr. Terry Brelje, Brelje Depo, pp. 102–106; Dr. Walter Fox, Fox Depo., pp. 71–160; and Dr. Gerald Clark, pp. 80–87.

ical restraint; said observations shall be fully detailed in the patient's record.

B. A psychiatrist must countersign the order of chemical restraint within twenty–four (24) hours, and said countersignature must demonstrate that the psychiatrist has personally attended the patient.

Except insofar as they are inconsistent with the above requirements, the defendants shall comply with all provisions of Ohio Department of Mental Health and Mental Retardation Rules 5119–3–01, "Prescription of Psychotropic Medications" and Rule 5119–03–04, "Restraint of Clients," copies of which are attached to this Order as Appendix A and B, respectively. [Omitted from Publication].

Within sixty (60) days of this date defendants shall provide the Court with satisfactory evidence that the above requirements have been incorporated into the policies and practices of the institution.

ISSUE 22: WHAT IS THE APPROPRIATE TIME PERIOD FOR THE IMPLEMENTATION OF ANY ORDER WHICH THE COURT MAY ORDER.

Although the parties have presented this issue as separate and distinct, it is the opinion of the Court that the time for compliance is properly set on the individual issues. The Court therefore will issue no formal order on this issue but will continue to set compliance timetables based upon the practical and legal implications of individual mandates. As has been pointed out is *Issue 23, infra,* compliance (and timing thereof) shall continue to be monitored by the Special Master.

ISSUE 23: WHAT ARE THE APPROPRIATE PROVISIONS FOR MONITORING COMPLIANCE WITH ANY ORDER WHICH THE COURT MAY ENTER?

Upon entry of the original order herein, the Court appointed a Special Master to monitor compliance and prepare reports to the Court regarding compliance, interpretation, and application of the Order to changing conditions. Delegation of compliance monitoring to the Special Master, aided by internal reporting procedures and the soon–to–be appointed Patient Advocate continue to appear to be the most effective and flexible method of ensuring compliance with the various Orders which have been issued herein.

The Court will therefore retain jurisdiction and continue the reference to the Special Master until such time as the maximum security psychiatric facilities maintained by the defendants are in full compliance with the mandates of the Court's Orders and appear reasonably capable of remaining so.

### REMAINING ISSUES

With respect to the remaining issues to be heard by the three–judge panel, the parties are hereby directed to meet within thirty (30) days for the purpose of attempting to reach stipulations as to said issues, and for the purpose of developing a mutually satisfactory discovery schedule. Said stipulations and discovery schedule are to be filed with the Court not later than November 15, 1980. If stipulations cannot be agreed upon, each party is directed to file a memorandum with the Court not later than November 15, 1980, delineating the issues to be heard and the discovery which remains to be completed.

IT IS SO ORDERED.